Next matter is Williams v. Secretary She said Williams and Walker, which is the Secretary. Yes. Good morning, Your Honors. My name is James Billsborough. I'm counsel for Appellant Craig Williams in Matter 14-1469 and Sean Walker in Matter 15-1390. Let me ask this. Let's assume that you're right about anything you argue about solitary confinement and the fact that it is extraordinary and beyond the ordinary incumbence that one would expect when incarcerated. How do you get past qualified immunity? What law is, what case is out there, what is out there that would suggest to these guards that holding someone on death row pending ultimate resolution of the sentencing phase of their conviction was a clearly established right? Not doing that was a clearly established right. Well, I would acknowledge that some of the defendants who didn't have any policymaking authority would probably not know that. They wouldn't have an ability to affect it one way or another. But the lead defendants in both cases surely could affect the DOC's policy. I would also note that in Mr. Williams case. But the policy allows them to do that, right? The policy dictates that this will happen. The policy 6.5.8 allows them to act as they did, but that policy doesn't flow necessarily from the Pennsylvania statute. The statute states that a prisoner shall remain on death row until the infliction of the death penalty or until lawful discharge from custody. And as the Pennsylvania Supreme Court. That's the policy? That's the statute. That's the legislative enactment. But my argument is that the policy doesn't flow necessarily from that statute. It may not, but that isn't, that begs the question of whether or not. You have to interpret that law and that statute to not make any change in the custodial status of the defendants. Correct. But I would argue that in Mr. Walker's case, there is a clearly established right to avoid indefinite conditions of solitary confinement after the death penalty is vacated. But we were talking about the, from the standpoint of the guards, how did, why are they not entitled to qualified employment? Inasmuch as they were doing everything that the regulations and the current law require. I think the law is very difficult with respect to the guards. And the guards couldn't say, well, if you guys don't belong here anymore, I'm going to ship you up to another unit. Right. That's why I agree that the law is very difficult with respect to the guards. But I would note one, that in Mr. Williams' case, the court did not rule on qualified immunity. The court ruled on the constitutional question. So the constitutional question is before the court in at least Mr. Williams' case.  Well, you could obviously avoid it under the doctrine of constitutional avoidance. You could argue that we should avoid it because even if there's a constitutional right there, I'm looking to find something that would allow me to conclude that it was clearly established, either in this circuit and it's not there in this circuit, or outside of this circuit. And there might be some cases outside of the circuit that suggest that the argument could be made, but they clearly don't say that was sufficient for us to allow us to conclude that it was a clearly established right at the time. Do they? Well, I would argue that the Schultz case clearly establishes that a prisoner has a right, a liberty interest in avoiding indefinite conditions of solitary. But in Schultz he wasn't held in the situation that Williams and Walker were held. There was no ‑‑ Schultz was not in a situation where there was a sentence of death imposed. Not imposed. Yeah, the sentence was imposed. An appeal was taken. He remained on death row during the resolution of the death penalty. Schultz was not held in that situation, was he? Right. You're right. Schultz is not exactly the same situation. But in Schultz, the prisoner was held in solitary confinement indefinitely. And I think those are the important factors. But in Schultz there was a review process, wasn't there? In other words, he did receive periodic reviews. Right. Oh, go ahead. Yeah. Is this what you're asking in this case? Yes. Is this what you're complaining, essentially, that this should be more like Schultz, that these two individuals should have gotten periodic reviews? Absolutely. When their death sentence was vacated and the state chose not to appeal, our argument is that they were deserving of periodic review. I understood that there were some administrative reviews. So I'm very curious. What is it that you say they should have ‑‑ what procedure should they have? What would it look like? What would their reviews look like? I think they were deserving of a review that could have changed their conditions of confinement. Oh, wait a minute. You're asking for the result. No, no, no. Change their conditions of confinement. What if the review said, no, you're still a danger, you really can't mingle with other people, and you really shouldn't be taken out of where you are? Okay, as long as the review is meaningful, I think that's okay. But they were foreclosed that. A review with some rationale as to why they're being kept where they are. Correct. And if you look at the facts here, both prisoners were released immediately to the general population where they remain today, the day their sentence was modified. So, you know, I wouldn't prejudge the results of any administrative review, but in Shotes, in Wilkinson, the prisoners received annual reviews that were meaningful. My understanding of the review here is that they can raise issues, but there's no possibility that they will be transferred. In fact, both prisoners raised numerous grievances and asked to be transferred, and every time they were told that the policy foreclosed their transfer. What do we have to say about the Pennsylvania regulation? The regulation is invalid? I think as applied to these prisoners, it violated procedural due process, yes. But if you have a review, as long as the policy stands, I'm sure your friend on the other side is going to argue that there's sufficient merit to the policy because the sentence of death, potential sentence of death, there's nothing to lose that's particularly dangerous, and therefore it requires a particular kind of housing. As long as that policy stands, why wouldn't the review simply be to determine whether or not the remand and the resolution of the legality of the imposition of the sentence has been decided? And if they said, well, it's still pending, it hasn't been decided yet, whether or not the death sentence was validly imposed, okay, he stays in solitary, he stays in death row, that would give you a procedural remedy, a procedural review that you're asking for, but it wouldn't help him. That's not really what you want. You want something that would allow these people, assuming good behavior, and I guess that's the kind of review you want, unless there's something there to suggest a threat in the general population and put him back in the general population until the death penalty, the death sentence is reimposed, then they go back to death row. That's the kind of review you want. Sure. I think as long as there's a meaningful chance that their conditions of confinement could be changed. I think if you're presupposing from the start that the officer will find that they remain on death row, then I don't think that that's really the type of administrative review that would be meaningful. Are there two statuses in the prison, either the general population or solitary confinement? Is there a middle status? My understanding is that there is a status called administrative custody, and there's variations within administrative custody. So I think some prisoners who are in administrative custody are very dangerous. They've demonstrated individually that they're dangerous, and they're housed in conditions that are probably much more restrictive than those on death row. And there are some folks on administrative custody who are probably housed in conditions less restrictive than those on death row. In fact, in my brief, I set forth some of the privileges that are accessible to folks in administrative custody that are not accessible to those on death row. One of the things that concerned me was the apparent difference between what you describe as the restrictions on prisoners on death row and what the Commonwealth describes. And they seem to find a lot more openings, a lot more chances to have television, to meet with people, to have longer recreation. And it disturbs me that the two sides don't agree with what these conditions are. Right. Why shouldn't we be meant to try to get some kind of finding as to what the conditions are? Well, I will note, in Mr. Williams' case, he proceeded pro se, and, you know, his factual record was not well developed. In Mr. Walker's case, he proceeded with counsel, and his record was a bit better developed. And, in fact, you can read on appendix page 41, the court finds, as a matter of fact, that the conditions of confinement in Mr. Walker's J unit are much more restrictive than the general population. And then the court goes on to describe why. He's strip searched when he comes in and out of the cell. He doesn't leave the cell for seven years as a result of that. It's true that the record is not well developed on some of these points, and I went to publicly available documents to try to show that those in administrative custody have privileges and benefits that those on death row do not. Most importantly, they get individualized review. But I will note also that many of the regulations I cited simply contradict the state's argument. I mean, in Pennsylvania Statute 4303, it states, as a matter of law, that no person is allowed to have access to the inmate without an order of the sentencing court, except staff, inmates counsel, and a spiritual advisor, and members of the immediate family. That's a pretty constricted group of people. I mean, and it's not what appears in the brief. So if there is a difference, yes, I do think a factual record needs to be developed. These prisoners are generally in this situation because they're dangerous, they're violent, and they have perhaps a history of violence. Why would a vacating the sentence change your custodial status? Well, I think it doesn't necessarily change the custodial status. I think it just allows the prisoners an opportunity to show that the presumption that Your Honor notes is not true in this case. And I think, I mean, if you just look at the facts here, both prisoners are released to general population the day their sentence is modified. And that's where they remain today. But they were put there in the first instance because of apparently a dangerous capital commission of a capital offense. That's true. But now they're life without parole, and I would submit that there's many prisoners in life without parole that are not housed in solitary confinement because they've proven to prison officials through the policies that the Pennsylvania DOC has enacted to allow individualized review to all prisoners except death row prisoners. Those who are on life without parole have had an opportunity to prove that they can exist in the general population without the restrictive confinement conditions of solitary confinement. Let me go back a moment, which is a point that I think is important in this case. What is it that you're seeking in terms of review? What we're seeking is meaningful individualized review. Periodic? Every 90 days? Well, I don't have a number, but certainly they should have had review the day that their death sentence was vacated and the state opted not to appeal. And what's the review to determine? Whether they're still in danger, whether they can live together with other people? I would submit that it's similar review that the state applies to. I'm asking because there already, I understand, is a review process. It may be insufficient. So now what is it that you're asking us to consider? So the fundamental difference between what we want and what we don't have is a process that would allow a change in conditions of confinement. Or not. Or not. Or not, correct. But to not presuppose the resolution in that determination. Has it been pretty much like a rubber stamp? We look at you and you stay here because you still haven't been resentenced? My understanding is that the review process that they receive now is an opportunity for them to say, this is bothering me X, Y, Z. But it's not a review of their conditions of confinement at all. In fact, both appellants raised grievances, numerous grievances, after their death sentences were vacated saying you should move me to general population and they were just given a flat no. It's not possible under the Pennsylvania policy. So, you know. Has anybody under those circumstances ever been taken out of the capital unit and placed in the general population? I don't know. While awaiting resentencing? Probably not as long as this policy has been enforced. And so I would guess no. But, you know, there's approximately 200 prisoners on death row in Pennsylvania. It wouldn't be much of a burden for the state to allow some meaningful individualized review to the few prisoners that have their death sentences vacated. You know. Do you know if the current review produces a written decision as to why the status quo is best? I do not. All I know is that in the record, the record reflects that both prisoners were told that they were not, that review was not capable of moving them off of death row. Decisions are essentially verbal decisions? I'm not sure if they're verbal or written, but they were both, it was communicated to both appellants that removal from death row was not possible until their sentence was formally modified. I see my time's up. It's even more complicated here because you've got the governor's moratorium on the death penalty. And in addition to that, there's a task force that's been appointed. It's, I guess, a year behind the date at which it's supposed to give a report that's looking into the efficacy and I guess it's efficacy and practicality. I'm not sure of the exact charge of the death penalty. And arguably, as a result of that task force's report, it's conceivable, I don't know how likely it is, but it's certainly conceivable that the death penalty in Pennsylvania could be rescinded or abolished. So that, from your point of view, that makes it even more egregious because it's not only Williams and Walker but the whole legal scenario puts the legality of the death penalty, the policy of the death penalty is really up in the air right now and in limbo. It may never ever be. None of those 200 people will ever be executed. Maybe you'll see me back here representing a class of prisoners. Hopefully they'll pay you. Your Honor, I didn't ask for two minutes because you started with a question. I just would like to clarify, can I have two minutes for rebuttal? Well, we don't usually do that. We let you go over with a red light. Okay. And I'm inclined to say no. Okay. If you're going to push me on it, you can probably get me to back down. Please. Boy, that was such a whippin' push. Is that the best you can do? You should be on the Duke Prosecution. I hate Duke. Thank you. And that would be a no. At least you're not a pushover. Yeah. Not on Mondays anyhow. On Friday I'd be inclined to say yes. May it please the Court, my name is John Noor. I'm with the Pennsylvania Attorney General's Office, and I represent our Secretary of Corrections and the other prison officials who are the appellees before the Court. Mr. Noor, has anybody ever told you you have remarkable resemblance to the Vice President? I looked up and I thought to myself, what in the heck is Joe Biden doing in the courtroom? Well, knowing Joe Biden pretty well, I disagree with you. You know better than I do. Okay. I'm not quite sure how to take that. No one's ever said that to me before. Okay, well then I guess it's not true. Go ahead. Your Honors, I think it's clear that the simplest way for the Court to resolve this appeal is by applying the clearly established prong of the qualified immunity analysis. And despite what my friend has said, this Court, of course, may affirm a district court on any basis supported by the record, whether or not the district court reached that issue. You know what I find troublesome about that? If we decide this on qualified immunity, it basically gives the individuals in this case and subsequent individuals permanent immunity because we will never establish once and for all the underlying issue. I mean, if you always come up and say give us qualified immunity, we'll never get to the merits. But can't we decide the constitutional issue and then say it will not apply here because of qualified immunity? And why shouldn't we do that? I know from your perspective it depends on how we decide that issue. But both my colleagues are right. The troubling thing is, especially given the luminous research that's come out lately, solitary confinement, and I'm not sure to what extent death row is tantamount to what I'm thinking of when I think of solitary confinement, but I'm sure there are a lot of similarities. Contracted custody in that situation can really wreak havoc on an individual. And this Supreme Court case, I think it was Justice Breyer, states that maybe it's time to take a look at indefinite confinement. Now, I know we're not talking about indefinite confinement here, but it could become that. Why shouldn't this be the case at which even if you were to say, okay, these defendants qualified immunity because until this case was decided, they could not have known because the right wasn't clearly established. Why shouldn't we take this opportunity to clearly establish the right? Well, you raise, I think, a very important point, Judge McKee, and that is this. There is no substantive challenge to solitary confinement in this case. But to get to the qualified immunity issue, you could argue it's a bit of a stretch, but I'm not sure it's an inappropriate stretch. And it's what both of my colleagues seem to be asking about. And I share that concern. If we always do qualified immunity, the right will never, if it's a right, I don't want to prejudge the merits of it, but if it's a right, it will never become clearly established because we'll always, every court will say qualified immunity, it wasn't clearly established, it wasn't clearly established, it will never, ever become clearly established. Well, sure. Now, first of all, the only right at issue in this case is the asserted right to a hearing. It's not a challenge to solitary confinement per se. And the issue you raise about how you never get to establish anything is, of course, always present in qualified immunity cases, and that's something the Supreme Court struggled with in Pearson and the cases that came before it, how do you go about this? And there's always a balancing that is up to the court on the one thing. But you can always decide whether the right exists and then determine whether there's qualified immunity. In Williams, it was decided on the merits, we could do it in the Williams case. That is certainly an option that's always open to the court, and you have to balance on the one hand the desire for constitutional avoidance and judicial economy and efficiency versus the desire for the substantive development of the law. And I've begun with qualified immunity, just as the court did, because it seems to be the clearest and easiest way to resolve this case and perhaps avoid what might be some difficult issues, and that also is a matter to be considered. Would you agree that the conditions that the defendants in this case were in can be described as atypical, certainly not typical with regard to the general population? I would agree that they are not typical with regard to the general population, but that, I would submit, is not the question. Atypicality has to be considered in the context of what you can expect to encounter as the result of your sentence. And in this case, sort of attached to the sentence itself is you're going to be on death row. But then the sentence is vacated, and they're still on death row. Forever. As the common law court said in the Clark case, the death sentence is the trigger for being on death row, but it is not the key to getting out, because even once the sentence is vacated, the safety and security concerns that accompany a death sentence, and which we can sum up in the phrase nothing left to lose, those concerns do not dissipate as long as the death sentence is a possibility. Well, actually, that's true. I thought they'd be happy as all heck once the sentence has been vacated. Now they've got something positive to think about. Yeah. And if they're out in the general population, they can think about if I misbehave, I'll go back into solitary, into administrative confinement. Well, that's a question to be resolved by the judgment of our prison officials. Okay. And shouldn't that be done in periodic review instead of saying we aren't going to deal with this at all? In their judgment, no. It is better to have an across-the-board rule, and you will find that in the record. It's 174 to 177. It's in the record, but it does lead to a situation where you get the three options in the trial, where this guy is never going to get ultimate resolution of the trial. The best he can hope for is indefinite postponement. We're kind of in the same situation here with the death penalty. The best they can hope for is indefinite postponement. But in the meantime, they're going to be on death row with no – because they're both off death row now. But that's kind of fortuitous under the policy. They can't stay down there forever. I think the best they can hope for is that they will ultimately be resentenced, but not to death. They'll be resentenced to life imprisonment. This is solitary – it is solitary confinement, isn't it? It is solitary confinement. Twenty-three-some hours a day? Correct. That is correct. And the conditions – And you don't consider that to be atypical with regard to the general population? Of course it's atypical with regard to the general population, but these are the conditions that are routinely imposed on all prisoners who receive a sentence of death. Speaking of those prisoners, can you tell me, Mr. Knorr, how many prisoners whose sentence has been vacated have, in fact, been resentenced to death in Pennsylvania, let's say, in the past 25 years? That I can't tell you. There's nothing in the record on that, and I don't know. Any that have been resentenced to death? I have no – I'm sure there have been, but I have no information on that, and there's nothing in the record on it. What I can tell you is that we have – I think it was the last person who was executed, and I was on that panel. That was a long time ago. I haven't heard of a Pennsylvania prisoner executed in at least 15 years. Well, actual executions, of course, have been quite rare in Pennsylvania, and it has been a great number of years. In terms of being resentenced to death. That's why I'm wondering why, if their sentences have been vacated, they're still deemed to be eligible for the death penalty when it's very unlikely, and it's certainly unlikely in this case. That's not an assessment that the prison officials can make, Your Honor. They have to take the sentence and the prisoner's status as they find it.  How likely is it that this prisoner is going to be resentenced to death? And even more important, how likely does he think it is that he's going to be resentenced to death? That is more important, but your opponent's point is that all his clients want is an opportunity to argue, periodically, that they can be trusted in the general population, that the risk that attends to them being in the general population is no greater than the ordinary inmate, or even the ordinary inmate who was convicted of first-degree murder, because most people convicted of first-degree murder do not get a sentence to death. Most of them, even if they're death eligible, the death sentence is not imposed on most people convicted of first-degree murder. Yes, that is what they're arguing for, but our prison officials have decided to adopt the blanket rule, and the validity of that rule as a matter of state administry of law is established and hasn't been challenged, and the substantive validity of it as a constitutional matter, say under the Eighth Amendment, is not challenged in this case. For people under sentence of death? For people under sentence of death or death eligible. There's no substantive challenge to the rule at all in this case. To the extent that those kinds of questions were ever raised, they have been explicitly abandoned in my friend's brief. What was any individual assessment made at all of these defendants in the capital unit? I'm sorry. Any assessment at all made of these two individuals, of Williams and Walker? As to whether they should be on death row or not? Yes. As to whether they're eligible to go to the general population or not? No. So de facto, or by regulation, I should say, they stay right where they are. That is correct. Once you receive a death sentence, you go on death row, and you stay on death row until the death sentence is removed as a possibility. That's the rule, and the validity of that rule is not challenged. I understand that, but let me get a handle on this. When someone, let's assume that the person acts, sentence of death, goes to death row, appeals, however many years later, the sentence is reversed and it's remanded back. He stays on death row. Then, ultimately, the sentence is reversed. He's off death row automatically? Yes. There's no individualized assessment at that point? What if you had someone on death row and the person thinks, we're not putting this guy back in the general population? Does that happen? Yes, that is exactly how it operates, unless there is some other reason. You know, if there are, I don't know, separations or a disciplinary problem, but all other things be equal, yes. As soon as the department learns that there's been a change in his status, that he's been resentenced to life without parole, he goes off death row. But if this is someone who has been acting out on death row, that person would be an individualized determination made, we're not putting him back in the general population. He goes into some kind of punitive segregation, some kind of, how do you define it? Some kind of restrictive housing. Yes, I think there's nothing in the record on that, but that is what would happen. If there was some other reason to keep him either in disciplinary custody or administrative custody, that would be the result of an individual assessment. Okay. So there's an individual assessment to keep him in, but there's not an individual assessment to let him out. That's what you're saying. There is no individual assessment either way. Well, if you decide this is somebody who has been acting out on death row, his sentence of death is reversed on remand, he does not automatically go into the general population. If the people, the guards, whoever it is on that wing, think this guy needs to be in some kind of restricted housing unit, that he goes there. He doesn't go into the general population. Maybe I didn't understand your question, but once the death sentence is removed as a possibility, he would be treated the same as any other prisoner. That is, he would go into general population unless there was some reason, after an assessment, for him to go somewhere else. Okay, but being treated like any other prisoner means there's an individualized assessment about where this guy should be housed. I'm sorry. Being treated like any other prisoner means there's an individualized assessment about where this guy should be housed. That is correct, because at that point he would be like any other prisoner, as opposed to being death sentenced or death eligible. Okay. Going back to the point I think you mentioned before, does a prisoner whose death penalty has been vacated pose the same institutional problems or threat as those who continue on the death penalty? That's what our prison officials believe, yes. You draw no distinction at all between the two categories. No, they do not. As long as there is a possibility. That's because of the policy. Yes. As long as there is a possibility that the death sentence will be reimposed, they feel that there are the same sorts of safety and security concerns, which I summed up in the phrase, nothing left to lose. And, again, that is 174 to 177 of the record. In the case of William, the district court found that his death row detention was caused by his own application to set aside the guilt finding. What if he hadn't made that application? If he had not continued to appeal the actual guilt conviction, then his resentencing would have occurred that much sooner. And, as we now know, he would have been resentenced to life imprisonment that much sooner and he would have been off death row that much sooner. So he stayed in for several years because he pursued his guilt phase appeal. I'm not sure that's quite fair because we didn't react to his decision. We would have done the same thing whether he appealed or not. That is, he stays on death row until he's resentenced. So I don't think it's quite fair to say that we kept him on death row because he appealed. His sentencing was delayed because of his pursuit of the conviction. Yes, that's correct. And, as we know from the record, that's a status that can exist for several years, and during that time we believe that they continue to present concerns. I see I have about 30 seconds left. Is that good news or bad news for you? Let me just say one thing about the actual conditions of confinement. As Judge Fuentes and I were discussing, they are significantly different from the conditions in the general population. They are not significantly different from the other conditions in administrative or disciplinary custody. And to the extent that they are different, they are actually more lenient. And they are certainly considerably more. Is this on the record? I know it's in some of the briefs. Yes, it is. You can find the administrative regulations that describe the conditions. They are cited in our brief and they are in the record. The conditions of confinement with citations to the record are in the red brief at page 7. What is the category of prisoners that goes into that administrative confinement? I'm sorry? What is the category of prisoners that go into that group that you just mentioned? I think you referred to them as administrative confinement. Administrative custody can be a number of reasons. It can be someone whom the staff believes present a safety or security danger even though they haven't actually committed a misconduct, and that would be like Mr. Schultz. It can be someone who needs separations from staff or prisoners for whatever reason, either because they are a threat or someone is a threat to them. It can be a number of different reasons. And then, of course, there is disciplinary custody, which is when you've actually committed a misconduct. The conditions are broadly comparable to those of the people in administrative custody, except to the extent that they are a little bit more lenient. And all of those record citations are in the red brief. Now my time is up. If there are any other questions, I'd be glad to answer them. Thank you, Your Honors.